**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| STEVEN GARCIA,<br><br>Plaintiff,<br><br>v.<br><br>CHICAGO TRANSIT AUTHORITY,<br><br>Defendant. | No. 20 C 7194<br><br>Judge John F. Kness |

**MEMORANDUM OPINION AND ORDER**

Defendant Chicago Transit Authority (CTA) moves for summary judgment on Plaintiff's claims of racial and national-origin employment discrimination and negligent spoliation. (Dkt. 62.) For the reasons that follow, the Court finds that no reasonable jury could find for Plaintiff on either claim. Accordingly, the motion for summary judgment is granted.

## I. BACKGROUND

Defendant Chicago Transit Authority (CTA) hired Plaintiff Steven Garcia—who is Hispanic and Mexican American—as a part-time bus operator in 2003. (Dkt. 68 ¶¶ 8, 10.) Plaintiff became a full-time bus operator in 2005 and qualified as a pool supervisor on August 11, 2019. (*Id.* ¶¶ 10–11.)[1] Pool supervisors are classified as bus operators, but CTA gives them opportunities to work in the pool as an acting

[1] Plaintiff's objections to the undisputed facts recited in this opinion are overruled.

supervisor as needed. (*Id.* ¶ 13.)

CTA requires pool supervisors to maintain a professional rapport with co-workers and management staff. (*Id.* ¶ 14.) Pool supervisors must always be able to communicate information expeditiously to the Control Center, the central hub for all calls where controllers and managers oversee communications and relay events by radio. (*Id.* ¶¶ 16 n.5, 17.)

When communicating by radio, supervisors are required to keep messages concise, using coded numbers where applicable; closely monitor and respond to the radio at all times while on duty; and give updates to the Control Center every five to ten minutes when reporting incidents. (*Id.* ¶¶ 22–23.) Under CTA's Radio Communication Procedures, employees must answer all calls promptly and must request that the caller stand by for follow-on transmissions if more time is needed to gather information. (*Id.* ¶ 24.) In addition, the Radio Communication Procedures require employees to maintain professionalism, keep emotions and opinions off the air, and maintain an even and low tone of voice when broadcasting, to avoid personality conflicts being transmitted through tone of voice or choice of words. (*Id.* ¶ 25.) As CTA representatives, pool supervisors must be respectful in all their interactions and never appear hostile or angry while on the radio. (*Id.* ¶ 16 n.5.)

On September 7, 2019, the Control Center directed Plaintiff to aid a particular bus on its route, and Plaintiff reported to the scene of a bus incident involving bus operator Whitney Washington. (*Id.* ¶ 27.) While at the scene of the incident, Plaintiff told the Control Center, via CTA's radio system, that he had to "run back to the detail"

to get the correct form for the operator to complete because Plaintiff had the wrong form. (*Id.* ¶ 29.) When asked to confirm his location, Plaintiff responded, "I heard you," and "I told you I was here," contrary to authorized call codes and terminology in the Radio Communication Procedures. (*Id.* ¶ 30.)

Bus service manager Norma Parker, who was monitoring the radio communications as part of her regular duties that day, heard Plaintiff's response to the Control Center's inquiry about his location and considered it "very rude." (*Id.* ¶¶ 28, 31.) In their respective testimony, Parker recalled that Plaintiff raised his voice "as if the controller were bothering him," and Washington confirmed that Plaintiff became increasingly irritated because of the Control Center's calls. (*Id.* ¶¶ 31–32.)

Plaintiff later testified that he was supposed to be given five minutes to assess the scene and ten minutes for his update. (*Id.* ¶ 33.) About six to ten minutes after Plaintiff arrived at the scene, after Parker heard Plaintiff's exchange with the Control Center, Parker instructed Plaintiff over the radio that the correct response to the Control Center was "10-4" or "no." (*Id.* ¶¶ 33–34.) Parker's communication with Plaintiff over the radio lasted for a few seconds. (*Id.* ¶ 34.)

Less than a minute later, Parker got on a phone call with Plaintiff per the Radio Communication Procedures. (*Id.*) During the phone call, Parker explained that Plaintiff's response and tone with the controller were rude and improper. (*Id.* ¶ 35.) Parker testified that Plaintiff would not let her speak because he repeatedly spoke over her and was being "very rude" to her. (*Id.*) Parker recalled that Plaintiff became

"a little belligerent" over the phone and began telling her what he could and could not do; in response, Parker explained to him that multitasking was part of the job. (*Id.* ¶ 36.) According to Parker, Plaintiff appeared not to be able to do the job from his protests "that it was 'too much' for him to handle" and that the Control Center kept calling him. (*Id.*) Plaintiff claims that he was stressed because Parker was harassing him with multiple phone calls. (*Id.* ¶ 33.)

In response to Plaintiff's statement that he could not handle the multitude of calls he was receiving from the Control Center regarding the incident, Parker asked Plaintiff if he needed to go home for the day, and Plaintiff responded, "That's your decision." (*Id.* ¶ 37.) Parker tried to direct Plaintiff over the phone, but she was unable to calm him down because he was too irate and would not listen. (*Id.* ¶ 38.) Parker asked Plaintiff to lower his voice and "stop hollering," but Plaintiff continued to speak over her, and Parker had to raise her voice to ask Plaintiff to calm down and listen to what she was trying to say. (*Id.*) Plaintiff testified that he felt that Parker was harassing and disrespectful and that he was trying to defend his character while rushing to get on the scene, unable to calm down because of his adrenaline and anxiety. (*Id.* ¶ 39.) Plaintiff admitted that he did not use "the best choice of words." (*Id.*) Parker instructed Plaintiff to meet her at a CTA bus garage. (*Id.* ¶ 40.)

When Plaintiff arrived at the garage, Parker asked transportation manager James Jackson to attend her meeting with Plaintiff as a witness. (*Id.* ¶ 41.) The parties dispute what happened at this meeting. According to CTA, Parker began asking Plaintiff about his behavior, and Plaintiff became irate in response, "hollering"

and "pointing his finger" at Parker. (*Id.*) According to Plaintiff, Plaintiff was gesturing with his hand when he said, "When you're finished, I want to be able to rebuttal [sic] what you have to say," and Parker misinterpreted his finger pointing as insubordinate. (*Id.* ¶¶ 41, 43.) The parties agree that James Jackson stepped in and asked Plaintiff to lower his voice and to stop pointing his finger. (*Id.* ¶ 42.) Plaintiff accused Parker of having harassed him and having threatened to remove him from service, and he threatened to call the Equal Employment Opportunity Unit. (*Id.*) Plaintiff was told that he could report any incident to the Equal Employment Opportunity Unit. (*Id.*) Then Parker, James Jackson, and Plaintiff each prepared a report to the manager. (*Id.* ¶ 43.)

James Jackson's report documented "Plaintiff's disrespectful and 'enraging behavior' [of] speaking to Parker in a 'threatening manner' " at the garage. (*Id.* ¶ 44.) James Jackson characterized Parker's conduct during the meeting as "nothing but total professionalism" and reported that Parker never raised her voice or said anything untoward to Plaintiff. (*Id.*)

Parker called Jairo Naranjo, the director of Control Center operations, to tell him of Plaintiff's insubordination and disrespect, that she was removing Plaintiff from service, and that she was sending Plaintiff for drug testing. (*Id.* ¶ 45.) After hearing Parker's explanation of Plaintiff's actions, Naranjo (who is Hispanic) supported Parker's decision to remove Plaintiff from service and send him for drug testing. (*Id.* ¶¶ 45–46, 60.) Parker removed Plaintiff from service, asking him to surrender his keys and radio, and had him undergo a drug test. (*Id.* ¶ 47.) Parker

referred Plaintiff to the business manager for "further case disposition." (*Id.*)

On September 10, 2019, Plaintiff and two union representatives had a hearing before business manager Monica Lewis and senior manager Valant Wright-Scurlock regarding Plaintiff's September 7, 2019 misconduct. (*Id.* ¶ 48.) At the hearing, Plaintiff was told that his behavior toward management personnel was unacceptable. (*Id.*) Plaintiff said that his treatment amounted to harassment and discrimination and that the September 7, 2019 incident was the second time that Parker threatened him with discipline. (*Id.* ¶ 49.) According to Wright-Scurlock, during the hearing, Plaintiff was combative and "failed to exercise the proper listening skills regarding disrespectful actions to supervisory personnel." (*Id.* ¶ 50.)

Under CTA's Corrective Action Guidelines (CAGs), which apply to CTA employees who are members of a bargaining unit, a first offense results in a final written warning and a one-day suspension. (*Id.* ¶ 68.) The CAGs also provide that insubordination, a verbal altercation with a fellow employee, and insolence or disrespect to management may warrant accelerated discipline. (*Id.*) Per the CAGs, Plaintiff was issued a final written warning and a one-day suspension for his September 7, 2019 behavioral violation. (*Id.* ¶ 50.) CTA disciplined Plaintiff for disobeying rules, orders, bulletins, or instructions; insubordination; conduct unbecoming an employee; use of abusive or obscene language in public; abuse of company time or poor work performance; disrespect to supervisors, coworkers, or the public; not using best judgment; and inattention to duty. (*Id.* ¶ 66.) On September 12, 2019, Plaintiff filed a grievance contesting the behavioral violation that resulted in

his one-day suspension. (*Id.* ¶ 51.) An arbitrator denied the grievance on February 25, 2020. (*Id.*)

If an employee has an infraction on his record during his time as a pool supervisor, he may be removed from the supervisor pool. (*Id.* ¶ 18.) On April 20, 2020, CTA interviewed Plaintiff in a "10-10 hearing," held to determine whether pool personnel will remain in the supervisor pool. (*Id.* ¶ 53.) Senior manager Lulvet Cooper, acting general manager Keith Wilkins, Plaintiff, and two union representatives were present. (*Id.*) Plaintiff was charged with "insubordination and disrespect to managerial personnel based on his not following orders and behaving 'in a threatening-type manner towards the Manager with yelling and being disrespectful, and finger pointing.'" (*Id.* ¶ 55.) At the hearing, Wilkins said to Plaintiff, "Steve, I can't have anybody speaking to . . . a manager this way. You're being expelled from the supervision pool." (*Id.* ¶ 57.) After the hearing, Plaintiff was removed from the bus supervisor pool. (*Id.*)

According to an agreement between CTA and Plaintiff's union,

> [i]n matters of discipline, unless the investigatory process requires additional time, the [CTA] will inform an employee and the Union as soon as possible and in any event no later than fifteen (15) calendar days after the CTA becomes aware of alleged misconduct or a rule violation by an employee and shall impose any discipline not more than ten (10) calendar days thereafter.

(Dkt. 71 ¶ 96.) Cooper later testified that the 10-10 hearing happened six months after Plaintiff's initial discipline "to allow for the grievance process to completely address and resolve the discipline," among other reasons. (Dkt. 68 ¶ 54.)

In his deposition, Plaintiff testified that he believed that he was treated

differently because of his race. (*Id.* ¶ 60.) Plaintiff also testified that nobody mentioned his race or national origin during his disciplinary meetings, but Plaintiff asserted that "[t]hey didn't have to" because "their actions spoke for themselves." (*Id.*)

On May 19, 2020, Plaintiff filed a grievance regarding his removal from the supervisor pool. (*Id.* ¶ 63.) An arbitrator granted the grievance in part and denied the grievance in part, awarding Plaintiff four hours of pay instead of the eight that Plaintiff requested. (*Id.*) The arbitrator's reasoning was "that management was not specific as to what [Plaintiff] did to receive discipline other than not meeting the standard work criteria for Pool Supervisor." (*Id.*)

Plaintiff later testified that two pool supervisors—Paul Spencer and Jacqueline "Jackie" Jackson—were African American and were treated better than he was. (*Id.* ¶ 70.) Plaintiff testified that Spencer "was making errors left and right. They removed him. He apologized, and he became a full-time supervisor." (*Id.* ¶ 71.) Plaintiff testified that he had a "real brief" conversation with Spencer about his performance and that someone (maybe Spencer) told him that Spencer "was out for a couple of weeks." (*Id.*)

Regarding Jackie Jackson, Plaintiff testified, "I think she was insubordinate to Mr. [Derrick] McFarland, she was removed for three months. I guess she apologized and she went back into supervision and she became a full-time supervisor." (*Id.* ¶ 72 (alteration in original).) Plaintiff testified that Jackie Jackson said that management perceived her as "cocky" and "sarcastic" and that she is "not kissing nobody's butt." (*Id.*) Plaintiff also testified that he did not know "the whole

story" about Jackie Jackson but "[j]ust bits and pieces of what [he] heard from other coworkers that she was sarcastic in her tone to McFarland and to whoever she talked to." (*Id.* ¶ 73.)

Plaintiff also testified that he was the only Hispanic in his bus supervisor training class. (*Id.* ¶ 19.) According to Plaintiff, his approximately twenty classmates—except for one Caucasian man—were African American. (*Id.*) Some of Plaintiff's classmates were not removed from the pool despite having been "involved in collisions, hit poles, and tested dirty for drugs." (Dkt. 71 ¶ 95.)

Parker testified that she verbally counseled other unnamed pool supervisors who spoke disrespectfully. (Dkt. 68 ¶ 21; Dkt. 64-2 at 189.) Those other pool supervisors were receptive to Parker's feedback and did not have further confrontations. (Dkt. 64-2 at 189.)

In this lawsuit, Plaintiff claims (in Count I) that CTA discriminated against him because of his race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17, and (in Count II) that CTA negligently spoliated evidence by failing to preserve a recording of the September 7, 2019 radio conversations between Plaintiff, the Control Center, and Parker. (Dkt. 56.)[2] Now before the Court is CTA's motion for summary judgment. (Dkt. 62.)

## II. LEGAL STANDARD

Summary judgment is warranted only if "the pleadings, depositions, answers

[2] In the operative complaint, Plaintiff also raised 42 U.S.C. §§ 1981 and 1983 as bases for his discrimination claims. (Dkt. 56 ¶ 1.) Plaintiff later waived any claims based on those statutes by clarifying that "any reference to them was a Scribner [sic] or typographical error." (Dkt. 68 ¶ 5.)

to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jewett v. Anders*, 521 F.3d 818, 821 (7th Cir. 2008) (quoting *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005)); *see also* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. As the " 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (cleaned up).

## III. DISCUSSION

### A. Summary Judgment Is Warranted for CTA on Count I (Employment Discrimination)

At the summary judgment stage in race and national-origin discrimination claims, courts must determine "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [or national origin] . . . caused the discharge or other adverse employment action." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A plaintiff may attempt to prove his claim in a holistic fashion or under the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023).

On the present record, however, Plaintiff cannot prove his claim under either test.

### 1. *Plaintiff Cannot Satisfy the* McDonnell Douglas *Framework*

Under the *McDonnell Douglas* framework, Plaintiff has "the initial burden to establish a prima facie case of discrimination, after which the burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual." *Id.* (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)). To make a prima facie case, Plaintiff must show that "(1) he is a member of a protected class; (2) he met his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside of the protected class were treated more favorably." *Id.* (quoting *Dunlevy*, 52 F.4th at 353). When the defendant "offers a legitimate, nondiscriminatory reason for the adverse employment action, courts may begin with the pretext inquiry" and omit the prima facie analysis. *Martino v. W. & S. Fin. Grp.*, 715 F.3d 195, 202 (7th Cir. 2013). The "mere articulation of the reason . . . puts the onus back on the plaintiff to prove pretext." *Pilditch v. Bd. of Educ.*, 3 F.3d 1113, 1117 (7th Cir. 1993).

CTA has offered a legitimate, nondiscriminatory reason for disciplining Plaintiff: that Plaintiff violated CTA rules when he was disrespectful to other employees. (Dkt. 63 at 7.) Insubordination is a legitimate, nondiscriminatory reason for disciplining an employee. *Flores v. Preferred Tech. Grp.*, 182 F.3d 512, 515 (7th Cir. 1999).

Because CTA has offered a legitimate, nondiscriminatory reason for

disciplining Plaintiff, the burden shifts to Plaintiff to "show that a genuine issue of material fact exists as to whether the defendant's proffered reason was pretextual." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009). Pretext in this analysis means "a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). To show a material issue of fact as to pretext, Plaintiff must show either "that an employer's explanation is not credible" or that "it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason." *Hudson v. Chi. Transit Authority*, 375 F.3d 552, 561 (7th Cir. 2004).

CTA's explanation is credible. The evidence, viewed in Plaintiff's favor, shows that Plaintiff violated CTA rules by speaking disrespectfully to other employees on the radio, on the phone, and in the garage. Plaintiff spoke rudely to the Control Center on the radio. (Dkt. 68 ¶¶ 28, 31–32.) Plaintiff would not let Parker speak when they were on the phone together because he repeatedly spoke over her and was rude and belligerent to her. (*Id.* ¶¶ 35–36, 38–39.) And when Plaintiff returned to the garage, he was irate and raised his voice to Parker. (*Id.* ¶¶ 41–42, 44–45.) By speaking disrespectfully, Plaintiff violated CTA's rules that employees communicate respectfully and professionally with each other. (*Id.* ¶¶ 14, 16 n.5, 68.)

In an attempt to prove pretext, Plaintiff raises two unavailing arguments that discrimination, rather than insubordination, caused CTA to discipline him: (1) that other employees were not as severely disciplined for misconduct; and (2) that the time prescribed for discipline in CTA's agreement with Plaintiff's union had elapsed before

CTA removed him from the supervisor pool.

As for the first argument, Plaintiff's purported comparators do not support the conclusion that CTA's explanation was a pretext. To support an inference of pretext, a comparator "must be directly comparable to the plaintiff in all material respects." *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 895 (7th Cir. 2025) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012)). A plaintiff "must usually 'show that the comparators (1) "dealt with the same supervisor," (2) "were subject to the same standards," and (3) "engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" *Id.* at 894 (quoting *Coleman*, 667 F.3d at 847). Plaintiff has not made the required showing for his purported comparators: Spencer, Jackie Jackson, supervisor training classmates, and other unnamed employees. Plaintiff has not argued that any of his purported comparators had the same supervisor as him, and all of his purported comparators engaged in conduct unlike Plaintiff's or had materially differentiating circumstances.

Plaintiff testified that Spencer "was making errors left and right. They removed him. He apologized, and he became a full-time supervisor." (Dkt. 68 ¶ 71.) Spencer's conduct was unlike Plaintiff's because Spencer was disciplined for making errors, not for insubordination. And unlike Plaintiff, Spencer apologized for his errors and only then returned to a supervisory role.

Regarding Jackie Jackson, Plaintiff testified, "I think she was insubordinate to Mr. [Derrick] McFarland, she was removed for three months. I guess she

apologized and she went back into supervision and she became a full-time supervisor." (*Id.* ¶ 72.) Although Jackie Jackson's insubordination may be akin to Plaintiff's, she returned to supervision only after apologizing.

Plaintiff also points to unnamed supervisor training classmates who were not removed from the pool despite having been "involved in collisions, hit poles, and tested dirty for drugs." (Dkt. 71 ¶ 95.) Assuming this unadorned statement is sufficient to present the classmates as purported comparators, the classmates' crashes and drug use are not materially similar to Plaintiff's disrespect and insubordination.

Finally, Plaintiff raises Parker's testimony that she verbally counseled other unnamed pool supervisors who spoke disrespectfully. (Dkt. 68 ¶ 21; Dkt. 64-2 at 189.) These other pool supervisors were receptive to Parker's feedback and did not have further confrontations. (Dkt. 64-2 at 189.) Plaintiff contrasts Parker's treatment of these other pool supervisors with Parker's treatment of Plaintiff, whom Parker sent for a drug test and then home. (Dkt. 69 at 8.)

Plaintiff's reliance upon these unnamed pool supervisors fails in the light of the factual record, which disproves the purported contrast. Parker counseled Plaintiff on the phone by explaining that Plaintiff's response and tone with the controller were rude and improper, and only after Plaintiff responded belligerently to Parker did Parker tell Plaintiff to meet her at the garage (thus beginning the disciplinary process). (Dkt. 68 ¶ 35–40.) Unlike the other unnamed pool supervisors, Plaintiff responded belligerently to counseling. Plaintiff's post-counseling belligerence

materially distinguishes his case, so the other pool supervisors who received counseling are not appropriate comparators.

With Plaintiff's purported comparators eliminated, one argument for pretext remains: that the time for discipline had passed when CTA removed Plaintiff from the supervisor pool. But that argument does not support an inference that CTA's stated reason for disciplining Plaintiff was pretextual. Plaintiff may be correct that the ten-day period for discipline (prescribed by CTA's agreement with Plaintiff's union) elapsed before CTA removed Plaintiff from the supervisor pool (although the agreement also allows additional time for investigation). (*See* Dkt. 71 ¶ 96.) But CTA explains that Plaintiff's grievance delayed its decision to remove Plaintiff. (Dkt. 68 ¶ 54.) *Cf. Shaw v. Monroe*, 20 F. App'x 563, 567 (7th Cir. 2001) (no indication of pretext where employer waited for employee's misconduct-related criminal trial before disciplining employee).

Even if the purported delay violated a labor agreement, CTA's "error alone was not pretext for discrimination" because there is no evidence that CTA followed the agreement for other employees. *Brooks v. Avancez*, 39 F.4th 424, 438 (7th Cir. 2022) (even if employer "had erroneously disciplined" employee for refusing to act as required by collective bargaining agreement that had not yet come into effect, employer's "error alone was not pretext for discrimination" because there was "no evidence that other employees were not asked to [so act] or not disciplined when they refused"). Because Plaintiff cannot show that CTA's proffered reason for terminating him was a pretext, he cannot prevail under the *McDonnell Douglas* framework.

### 2. *Plaintiff Cannot Otherwise Prove Racial or National-Origin Discrimination*

Plaintiff's purported evidence of pretext, analyzed above, is the same evidence suitable for evaluation under the holistic method, in which both direct and circumstantial evidence of intentional racial or national-origin discrimination is considered to determine whether a reasonable factfinder could conclude that the plaintiff's race or national origin caused adverse employment action. *See Wince*, 66 F.4th at 1040. As explained above, neither the purported comparators nor the delay in removing Plaintiff from the supervisor pool could permit such a finding, and Plaintiff has highlighted no other evidence of racial or national-origin discrimination.

## B. Summary Judgment Is Warranted for CTA on Count II (Negligent Spoliation)

### 1. *The Court Retains Supplemental Jurisdiction of Count II*

Although the usual practice in the Seventh Circuit is to relinquish supplemental jurisdiction of remaining state-law claims after granting summary judgment against a plaintiff on his federal claims, the court may retain jurisdiction of the state-law claims when judicial economy, convenience, fairness, and comity weigh in favor of retaining jurisdiction. *See Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994). Those factors point to retention here because, as explained below, "it is absolutely clear how [Count II] can be decided." *Id.*

### 2. *Plaintiff Cannot Prove Negligent Spoliation*

Plaintiff cannot prove that CTA negligently spoliated evidence by failing to preserve a recording of the September 7, 2019 radio conversations because there is no evidence that the loss of the recording was the proximate cause of Plaintiff's

inability to prove his employment discrimination claim. Plaintiff's spoliation claim arises under Illinois law, which requires him to prove that the loss or destruction of the evidence was the proximate cause of his inability to prove the underlying lawsuit. *See Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012).

Because there is no evidence to support a reasonable inference that the missing recording would support a finding of discrimination, a rational jury could not find proximate cause for Plaintiff's spoliation claim. Instead of explaining how the recording would support his discrimination claim, Plaintiff merely speculates—without reference to any evidence—that the recording might show "what tone of voice each actor used, whether the walkie talkie played a role in the difficulty [of] communication, and actual time frames or lapses." (Dkt. 69 at 12.) This lack of evidence of how the recording could have affected Plaintiff's employment discrimination case is fatal to the spoliation claim. Summary judgment for CTA on this count is therefore warranted.

## IV. CONCLUSION

Defendant's motion for summary judgment (Dkt. 62) is granted.

SO ORDERED in No. 20 C 7194.

Date: September 25, 2026

JOHN F. KNESS
United States District Judge